

NEW JERSEY OFFICE                                                                                      NEW YORK OFFICE
06 POMPTON AVENUE, SUITE 25                                                                  347 5TH AVENUE, SUITE 1402
CEDAR GROVE, NJ 07009                                                                                 NEW YORK, NY 10016
(973) 239-4300                                                                                                (646) 205-2259

LORRAINE@LGRLAWGROUP.COM
WWW.LGAULIRUFO.COM
FAX: (973) 239-4310
_____

June 14, 2024

*Via ECF*
Hon. Victor Marrero
United States District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

                              Re: United States v. Marvavier Rian Hurts
                                   23-CR-394-01 (VM)

Dear Judge Marrero:

      This sentencing submission is offered on behalf of Marvavier Rian Hurts, ("Mr. Hurts" or "Rian"), who is scheduled to be sentenced by Your Honor on June 28, 2024. Mr. Hurts requests this Court determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553. Rather than imprisonment, Mr. Hurts requests a sentence of time served followed by a term of supervised release of not more than one year. This sentence is sufficient but not more than necessary to satisfy the goals of sentencing. The legal and factual support for this request follows.

      **I.**      **Preliminary Statement**

      Born and raised in Alabama, Rian and his siblings enjoyed a wonderful childhood. From a young age, Rian demonstrated commendable character traits—he has always been a loyal, hardworking, compassionate, generous, educated man of integrity. Rian has dedicated his life to serving others—he had a career as a special education teacher, and, after the tragic birth of his niece who was born with severe disabilities, changed career paths to become a nurse. That such an upstanding citizen made such a grave error and engaged in conduct that was so antithetical to his way of being was the result of desperation and taking on a family burden that was ultimately

not his to take. Mr. Hurts is extremely remorseful for his actions and knows that his desperation does not excuse his conduct. To that end, Mr. Hurts has taken full responsibility for his conduct by pleading guilty and since his release has maintained an infraction-free, productive life-style—still dedicated to helping others. As set forth below, all the factors of this case support a sentence of time served.

## II.  Procedural History

On July 27, 2023, Mr. Hurts was arrested pursuant to a warrant in Atlanta, Georgia and remanded to custody. *See* Pre-Sentence Investigation Report ("PSR") ¶ 47. On August 2, 2023, a three-count indictment was filed charging Mr. Hurts with three counts of Transmission of Interstate Communications with Intent to Extort in violation of 18 U.S.C. § 875(d). *See* Docket No. 3. Mr. Hurts was transported to the Southern District of New York, and on August 17, 2023 appeared before the Hon. Katherine H. Parker for an initial appearance. *See* Docket No. 6. On November 7, 2023, Mr. Hurts was released on bond with conditions. *See* Docket No. 10. On March 21, 2024, pursuant to a plea agreement, Rian pled guilty to Cout One in the above-referenced indictment. PSR ¶ 6. Pursuant to the plea agreement, Mr. Hurts' advisory guideline sentence range is 18-24 months imprisonment. PSR ¶ 6, 117. Based on Mr. Hurts history and characteristics, Probation has recommended a variance from the advisory guideline range to 8 months imprisonment—only four and a half more months than he has already served. Rian was detained for approximately three and a half months before release on bond on the instant offense.

## III.  Background Facts

Rian Hurts was born in February, 1981 in Tuskegee, Alabama. ¶ 71. The oldest of five children, Rian was raised in a stable home, until his father moved out of the family home when Rian was in high school. PSR ¶ 71-73. While Rian maintained regular contact with his father, he sought counseling in high school to address the mental and emotional impact of his parents' separation. PSR ¶ 73, 78. Rian has a great relationship with all of his siblings and his parents today. Currently, he lives with his mother and one of his brothers, RaShonn, in Union Springs, Alabama. PSR ¶ 75.

Rian is single, has never married, and has never fathered any children. PSR ¶ 74. He is in good physical health and has no history of substance use disorder. PSR ¶ 77, 80-81. Since December 2023, Rian has been attending therapy to help cope with the mental stress and anxiety he has been dealing with as a result of the instant case. PSR ¶ 79. The instant offense marks Rian's first criminal conviction. PSR ¶ 64-68. Since release on bond in this matter, Mr. Hurts has been completely compliant with the conditions of his pretrial supervision. PSR ¶ 7.

Rian is incredibly dedicated to his educational pursuits. Rian graduated high school in the top 21% of his class, and obtained an impressive 3.18 GPA in the first year of his undergraduate program at Tuskegee University. PSR ¶ 86, 87. After his freshman year, Rian transferred to Auburn University in Auburn, Alabama and graduated in July 2003 with a Bachelor of Arts in Political Science. PSR ¶ 85. Rian continued on with his educational aspirations at Auburn University and earned a Master's of Public Administration in 2005. PSR ¶ 84. In addition to his

educational goals, in the past Rian has held a real estate license and a teacher's certificate, both of which are no longer active. PSR ¶ 83, 88. His arrest in this case did not stop him from pursuing even more vocational and educational accolades—since January 2024, Mr. Hurts has been enrolled in a practical nursing certificate program at Wallace Community College in Dothan, Alabama, and is expected to complete all requirements by December 2025. PSR ¶ 82. Rian was motivated to make this career change by his newborn niece, who was tragically born with severe brain damage due to birthing complications. His niece requires around the clock care.

In addition to his educational endeavors, Rian is an incredibly dedicated employee, and has been consistently gainfully employed since 2001. PSR ¶89-108. Rian was working concurrently while studying for his undergraduate degree as a sales representative for Verizon Wireless, and worked part time as a social-studies teacher while beginning his graduate studies. PSR ¶ 105-108. While Rian was unemployed while he was finishing up his Master's degree, he quickly found work after graduation as a manager of a national hotel chain before moving on to various roles in logistics and operations after moving to Los Angeles, California. PSR ¶ 93-102. In 2020, Rian quit his job as the director of fulfillment for a visual marketing company to pursue his lifelong goal to become a teacher. PSR 94. Rian moved to Decatur, Georgia and became a special education teacher, where he was employed until his arrest for the instant offense. PSR 91-92. Since March of 2024, Rian has been employed part-time as front desk personnel at the Hampton Inn in Eufuala, Alabama. PSR ¶ 89-90.

The letters Rian's loved ones have provided to Your Honor in support of him illuminate common themes—those who know Rian know him to be fiercely loyal, compassionate, and protective, not only to his loved ones, but to those in the community he is committed to serving.

Rian's first cousin, Twyla Johnson, recalls that she can always count on Rian for great advice, and he taught her to "always keep your head up no matter the circumstances and to rem[ain] kind." *See* Twyla Johnson Letter, attached hereto as Exhibit A. Twyla shares a poignant memory she has of Rian that demonstrates his loyalty and protective nature:

> A memory I always tell anyone who ask about my upbringing with my family, I would mention Rian the days he would take all give of us, me and his four siblings to school each morning. Rian had an older car that my mom had given him, and he was so grateful for that car, but I didn't like the car and I didn't want to be dropped off in the front of the school in that old car. Every morning, I would beg Rian not to take me to the front of the school and he would say okay he would see just not to see me cry. Just like always he would do just as my mother told him to do to dropped me off at the front door of the school and make sure I walked inside, and this is just what he did. I would be so upset but once I got out the car, he would always say, "Bye Twyla have a good day" while smiling and waving. I do the same with my daughter even today.

*Id*. His aunt, Lillie Johnson, echoes the sentiments illustrated by Twyla's memory, saying that

3

Rian "is always concerned for others, especially his family." *See* Lillie Johnson Letter, attached hereto as Exhibit B. Rian has always been "selfless, generous, and caring" and often helped his mother with household chores and took care of his two youngest siblings. *See* Annie Grace Johnson Letter, attached hereto as Exhibit F. Rian's brother, Martellious, says that Rian is "the glue that holds [his] family together," and "the person that [he] can always depend on." *See* Martellious Hurts Letter, attached hereto as Exhibit C. Rian came to all Martellious's games when he was growing up and supported him both financially and emotionally when Martellious was in college. *Id*. Even now, Rian is the person Martellious calls on when he needs a babysitter for his daughter. *Id*. Rian's other brother, RaShonn, has "always looked up to [Rian] as a mentor" and "learned the importance of hard work, adaptability, respect, and generosity from him." *See* RaShonn Hurts Letter, attached hereto as Exhibit G. Isha, his sister, credits Rian as "the mainstay" of their family. *See* Isha Hurts Letter, attached hereto as Exhibit H.

Rian's friends and coworkers also hold him in high regard. His friend of over 10 years, Anthony Charles, can speak to Rian's commitment to the community. *See* Anthony Charles Letter attached hereto as Exhibit D. Rian "often goes that extra mile to make the people around him feel loved and appreciated," and even sold Anthony his first home when he was a real estate agent. *Id*. One of Rian's "greatest" friends for over 25 years, Kevin, speaks to Rian's compassionate nature, noting that he and his family became Kevin's "surrogate family" as Kevin had few people to depend on in his life. *See* Kevin Lee-Wellington Letter attached hereto as Exhibit J. Another friend, Julia Martin, describes Rian as "an exceptional education teacher," who "provided superior accommodations to meet the individual needs of each student he served." *See* Julia Martin Letter, attached hereto as Exhibit E. "As a result of [Rian]'s commendable effort, his students were able to complete assignments to pass required courses for promotion." *Id*. Carnetta Clark, another prior coworker, notes that Rian "has proven an unwavering commitment to his students," and he has "not only helped his students excel academically but has also inspired them to become thoughtful and engaged members of their community." *See* Carnetta Clark Letter, attached hereto as Exhibit I.

While his friends and family members were shocked to learn of Rian's transgression, they each know that "Rian is more than the sum of actions that led to this moment." *See* Exhibit D. Julia knows that by "expressing remorse and taking concrete actions toward rehabilitation," Rian will "learn from this incident and continue contributing to society." *See* Exhibit E. His brother Martellious knows Rian is very remorseful for his actions, and his aunt Lillie knows the same—that "he has learned from this experience and will not think of repeating it," and that he "will strive to make amends with the family support." *See* Exhibit B, C; *See also* Exhibit G, (RaShonn Hurts noting that Rian "is very remorseful," and he is "currently witnessing [Rian] making daily strides [to] be a better person"); Exhibit H, (Isha Hurts noting that despite his mistakes, Rian "will continue to be a productive and law-abiding member of society, as well as a great addition to the healthcare field").

### IV. The Offense

On March 21, 2024, Mr. Hurts pled guilty pursuant to a plea agreement to one count of Transmission of Interstate Communications with Intent to Extort in violation of 18 U.S.C. § 875(d). PSR ¶ 6.

4

### V. The 18 USC § 3553(a) Factors Support Sentence of Time Served.

A sentencing court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81 (1996)). To conduct an individualized assessment, the Sentencing Reform Act provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This right is fundamental to our sentencing process and has recently been affirmed by the United States Supreme Court. *See Concepcion v. United States*, 142 S.Ct. 2389, 2398-99 (2022) ("There is a 'long' and 'durable' tradition that sentencing judges 'enjo[y] discretion in the sort of information they may consider' at an initial sentencing proceeding.").

As contemplated by the Supreme Court, this Court's ability to consider all relevant information at the time of Mr. Hurts' sentencing is critical to its ability to fashion a just sentence in his case. *See Pepper v. United States*, 562 U.S. 476, 488 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will not suit merely the offense but the individual defendant."). Consistent with this principle, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors. *See* 18 U.S.C. § 3553(a)(1)-(7). Against the backdrop of these factors, Mr. Hurts respectfully submits that a variance to time served is warranted in this case.

#### a. Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The significance of the first § 3553 factor is based on its comprehension that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.) ("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing when his very future hands in the balance").

##### i. History and Characteristics of the Defendant

The tenant that a defendant's criminal conduct must be measured against his overall life has resonance in this case. The weighing of the good with the bad in Mr. Hurts' life reveals that his criminal conduct should not provide the sole basis for judging his fate. Rather, Rian's history and characteristics show that his life has been marked by dedication to education and helping those in need. Case law supports the proposition that a defendant's history of good works supports a variance. *See e.g.*, *United States v. Tomoko*, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $255,000 and faced a guideline sentence of 12-18 months, district court's sentence to probation on condition of one year home detention

5

was not unreasonable because of his "negligible criminal history, his employment record, his community ties, and his extensive charitable works"); *United States v. Thurston*, 554 F.3d 22, 26 (1st Cir. 2008) (where defendant was convicted of fraud in excess of five million dollars and his guidelines were capped at 60 months, the district court's sentence of 3 months was affirmed based on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *see also United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (similar).

Rian maintains a close relationship with his family. While they are all shocked and saddened by Rian's conduct, they all remain incredibly supportive of him. As demonstrated through the overwhelming outpour of support from his friends and family, he is an incredibly loyal, supportive, and protective person to have in your corner. *See* Letters A-J. He has no criminal history to speak of and no substance use history. He has been proactive in getting on top of his mental health and has attended therapy to help him cope with the stress that his criminal matter has caused him. He has been perfectly complaint with his conditions of pretrial release. Most notably, Rian has demonstrated an exceptional commitment to higher learning and helping those in need. After he graduated from his master's program and worked for a few years, he finally worked up the courage to quit his job and fulfill his dream of becoming a teacher. He worked in Decatur, Georgia as a special education teacher for over three years. In that role, he strived to make a difference in each of his students' lives, and was committed to ensuring each of them was promoted to the next education level. While he was devasted that he had to give up his teaching license due to his arrest, he did not let that stop him from pursuing a career where helping people is the central goal. Motivated by the traumatic birth of his niece, who requires around the clock care, Mr. Hurts has been enrolled in a practical nursing certificate program and is on track to complete that program by December 2025. All the while, he is working part time to support himself and ensure his achievement of his educational goals. A sentence of time served will allow Rian to finish what he has started. He looks forward to a successful career making meaningful contributions to our society.

### ii. Nature and Circumstances of the Offense

Having considered Mr. Hurts' history and characteristics, the essential question is how a man, who shows such redeeming characteristics and has been a law-abiding citizen up until this point, could have committed this crime. The gravamen of his offense is that he extorted an individual for money by threatening to publish private information about that individual that could be damaging to his reputation. He was ultimately unsuccessful—no private information about that individual was published by Mr. Hurts, nor did he receive any money from that individual as a result of his threats. *See* PSR ¶ 49.[1]

While such a description is accurate, it is ultimately incomplete. Although Rian's

---

[1] The defense takes issue with the victim's impact statement as set forth in Paragraphs 49 to 54 in the PSR. The defense is sensitive to the victim's mental and emotional anguish resulting from this offense and does not doubt it is burdensome. However, to state that the "details of the offense becoming public curtailed Victim-1's economic opportunities" to the tune of $3.2 million is inaccurate and a mischaracterization of the facts of this case. Mr. Hurts never disclosed the video in question to anyone, other than the victim him/herself. No one other than Mr. Hurts, the victim, the government, and the defense have seen this video. Further, the details of this case have not publicly linked Mr. Hurts to the victim, as corroborated by a quick Google search.

actions were certainly wrong and illegal, and he accepted full responsibility for his conduct by pleading guilty to this offense, his actions were not entirely motivated by a desire to enrich himself. As mentioned, Mr. Hurts' niece was born after a tragic birthing complication. She has severe brain damage and requires care around the clock. His family was struggling financially to keep up with her medical care costs. Fueled in part out of desperation, and an obligation to take on his sister's burden as his own, he made incredibly grave mistake—one that he will carry with him for the rest of his life. *See* Exhibit F (Rian's mother surmising that Rian was "desperately trying to fix everything for his siblings," but noting that is "very remorseful about it" and is not "in counseling and on a different career path that will help [his niece]"); *see also*, Exhibit J (his friend Kevin questioning whether "he was under insurmountable stress to help with the care of his physically [] disabled niece"). While this should by no means excuse his crimes, it introduces a mitigating aspect of Rian's criminal conduct. Although misguided, Rian believed he would be able to help his family.

Mr. Hurts' motive for committing the instant offense is a relevant sentencing consideration since it directly impacts his culpability. That is, the degree of a defendant's culpability "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

While Mr. Hurts' is certainly liable for his criminal actions, his lesser culpability calls for a lesser sentence. Indeed, the advisory guideline range of imprisonment for this offense is the same whether the defendant successfully extorted the victim or not. *See* U.S.S.G. § 2B3.2(b)(2) ("If the greater of the amount demanded **or the loss to the victim** exceeded….") (emphasis added). Supreme Court precedent and the guidelines themselves recognize the validity of this argument. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 305 (2002) ("As to retribution, the severity of the appropriate punishment necessarily depends on the offender's culpability"); USSG § 2G2.2 (reducing offense level by two-levels where the defendant does not intend to traffic in, or distribute child pornography); USSG § 2L1.1(b)(1)(for passport offenses, if "the offense was committed other than for profit" decrease the offense level by three levels); USSG §§ 2D1.1 and 5C12 (reducing guideline level and eliminating minimum mandatory based on safety valve which applies to less culpable and less dangerous offenders).

    **b. The Need for the Sentence Imposed…**

        **i. To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A sentence of time served followed by a period of supervised release adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Mr. Hurts spent approximately three and a half months in jail. During those three and a half months, he was subject to horrible conditions, being transported between jurisdictions through Oklahoma.  Moreover, he now, for the first time, has a felony conviction on his record.

This Court should consider the significant punishment resulting from the collateral consequences Mr. Hurts will now face as a result of this conviction. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary except attached hereto as Exhibit K. Of these 641 collateral consequences, 497, or 78% of them, may last a lifetime. *Id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-18, 2016 WL 3022073 at *1 (E.D.N.Y. May 24, 2016) (Block, J.) (varying downward from a guideline range of 33-44 months imprisonment to one year probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). As *Nesbeth* establishes, the civil death that Mr. Hurts faces due to his conviction constitutes significant punishment. *See also*, Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

Finally, Mr. Hurts has pled guilty and taken responsibility for his conduct in this case. He is extremely remorseful for his actions and has taken to therapy to deal with the anguish he has caused himself. While he takes full responsibility for his actions, a consideration of his mental condition as a result is important in terms of the punishment he has received for his crime. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012) (citing the district court's observation that "sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed").

### ii. To Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant

A sentence of time served followed by a period of supervised also affords adequate deterrence, both general and specific, and serves to protect the public.

#### 1. General deterrence

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, prosecutors consistently argue the factor of general deterrence in support of guideline sentences. And why not? If you consistently assert that prison sentences are not only necessary to punish the Defendant but also needed to prevent crimes, then you gain strong support for guideline sentences that nearly always require imprisonment. The troubling aspect of this is that it is wrong and has led to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015).

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id*; *see also* Gary Kleck and J.C.

Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent." *Id*. at 1031. Perhaps, what is even more troubling about a federal prosecutors' embrace of general deterrence is that such a posture contradicts their employer's perspective on the matter. Indeed, the United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit L. In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. S*ee id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

### 2. Specific deterrence

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Hurts' request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. The second part asserts that Mr. Hurts' history and characteristics prove that he will never commit another crime.

### 3. The relationship between incarceration and recidivism

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit M. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6 Criminology & Public Policy 589 (2007). *See also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

9

### 4. Mr. Hurts' lower risk of recidivism

The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492. Mr. Hurts is 43 years old and has no criminal history. Moreover, he is highly educated, has been employed throughout his life, and does not have a substance abuse problem. Because of his education level, employment history, and lack of substance abuse, Mr. Hurts poses a lower risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004). Probation agrees. *See* PSR p. 34.

In imposing the least restrictive sentence sufficient to account for the need to protect the public from further crimes of Mr. Hurts, this Court should consider the statistically low risk of recidivism he presents. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties). The fact that Mr. Hurts is in a Criminal History Category of I at the age of 43 further supports his request for a variance. *See, e.g.,* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."). Moreover, that Mr. Hurts has been on pretrial release for the past eight months without incidents demonstrates his ability to comply with conditions and refrain from engaging in any other criminal conduct.

### iii. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, Or Other Correctional Treatment in the Most Effective Matter

Based on his extensive educational and employment history, and his lack of substance use history, Mr. Hurts would not benefit from any educational, vocational, or treatment programs in the Federal Bureau of Prisons. In fact, incarceration would hinder his ability to finish his educational programming.

### c. The Kinds of Sentences Available

A mandatory minimum sentence does not apply in Mr. Hurts' case. Thus, a sentence below the advisory guideline range is permissible. Mr. Hurts is not statutorily required to spend any time in prison at all—because of the nature of his conviction, a Class E felony, the law allows this Court to sentence Mr. Hurts to something entirely other than imprisonment—namely, probation. 18 U.S.C. § 3561(c)(1). Despite this statutory authority, the U.S.S.G. § 5B1.1 comment n.2 indicates that because Mr. Hurts' sentencing guideline range is in "Zone D" of the sentencing table, he is not eligible for a probationary sentence. While Mr. Hurts is not suggesting that any other sentence than a time served sentence followed by a term of supervised release would be warranted in this case, the contradiction between Congress's will and the U.S. Sentencing Guidelines highlights that the advisory guideline range gives us a false sense of reasonableness and rationality, as discussed further below.

### d. The Kinds of Sentence and the Guideline Sentencing Range and The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

A critical question in Mr. Hurts' case is the exact weight this Court should give to the advisory guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

The guidelines pose a particular risk in Mr. Hurts' case for a more elemental reason—they falsely provide a promise of predictability and fairness. Regarding the false promise of the guidelines, one district court aptly noted:

> Criminal behavior can fuel public outcry and drive broad legislative and executive agendas to get "tough on crime." But how does that translate to specific instances? If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F. Supp. 2d 1335, 1337-1338 (M.D. Fla. 2005).[2]

Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we often assume that they provide clear direction for the proper sentencing of every criminal defendant, notwithstanding their backgrounds and the unique circumstances of their case.[3] Thus, we depend on the guidelines to relieve us of the burden and uncertainty of having to decide a just sentence for the any defendant.[4] This reliance is misplaced. The guideline ranges have often and dramatically failed our system of justice in creating results that are fundamentally unjust. For instance, for years, the guidelines for crack cocaine created a situation where defendants were harshly and unfairly sentenced.

This backdrop, coupled with the The Judiciary Sentencing Information (JSIN) applicable to Mr. Hurts as listed in the back of his PSR, strongly supports his request for a variance in this case. The JSIN in Mr. Hurts' PSR indicates that "During the last five fiscal years

---

[2] Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *Kimbrough v. United States*, 552 U.S. 1353 (2007).

[3] Of course, the guidelines do address the background of each defendant and the circumstances of each case in a limited fashion through criminal history and offense conduct.

[4] At its core, the rigid matrix of the sentencing guidelines demonstrates the deeply-rooted human aversion to uncertainty and ambiguity. *See, e.g,* Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013). As Konnika asserts, studies demonstrate that the need to respond to uncertainty or a lack of clarity is present in the early stages of human development. *Id*. Because of our distress with the unknown and uncertain, we seek to achieve "cognitive closure" defined as the "desire for a firm answer to a question and an aversion to ambiguity." *Id*. (citing Dr. Arie Kruglanski, *Motivated Closing of the Mind*, Psych. Rev., at 263-83 (Apr. 1996)).

(FY2019-2023) there were 6 defendants whose primary guideline was § 2B3.2, with a Final Offense Level of 15 and a Criminal History Category of I"—the same final offense level and criminal history category applicable to Mr. Hurts. *See* PSR ¶ 27.[5] Of the four defendants (67%) who received a sentence of imprisonment, "the average length of imprisonment imposed was 9 month(s) and the median length of imprisonment imposed was 8 month(s)." *Id*. Accounting for six defendants, "the average sentence imposed was 7 month(s) and the median sentence imposed was 5 month(s)." *Id*.

These statistics further support that the advisory guideline range should not and is not the whole picture of a criminal defendant that should be considered when imposing sentence. In fact, in light of the sentences similarly situated defendants actually received, the advisory guideline range should be given very little weight in this Court's analysis, or no weight at all. The very bottom of Mr. Hurts' advisory guideline range is more than double the average sentence imposed for similarly situated defendants in the last five years. He has already served approximately three and a half months—half of the average sentence imposed. Moreover, these statistics don't account for the harm sustained by each defendant's conduct. In other words, it is quite possible that each of these other 6 defendants actually caused reputational harm or received money as a result of their extortion efforts. Were that the case, a sentence in Mr. Hurts' guideline range would surely cause unwarranted sentencing disparities. A sentence of time served followed by a term of supervised release will ensure that Mr. Hurts' sentence is on par with similarly situated defendants.

### e. The Need to Provide Restitution to Any Victims of the Offense

Restitution is not an issue in this case. PSR ¶ 127.

## VI. Conclusion

Given all of the facts and surrounding circumstances, it is respectfully requested that a sentence of time served followed by a period of supervised release is a sentence that is sufficient, but not more than necessary to satisfy the goals of sentencing. Mr. Hurts respectfully requests that the Court impose such a sentence.

Respectfully submitted,

s/ Lorraine Gauli-Rufo, Esq.
Lorraine Gauli-Rufo, Esq.
*Attorney for Marvavier Rian Hurts*

cc: Nicholas W. Chiuchiolo, AUSA

---

[5] This excludes defendants who received a substantial assistance departure under §5K1.1.